IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JAMISON SVOBODA, | : | Case No. 5:18cv01443 |
|  | : |  |
| Plaintiff, | : |  |
|  | : | Judge John R. Adams |
| v. | : |  |
|  | : |  |
| TIMKENSTEEL CORPORATION, ET AL., | : | **ORDER** |
|  | : |  |
| Defendants. | : |  |

This matter is before the Court on the motion of Defendants TimkenSteel Corporation ("TimkenSteel"), Brent Vogt, and Michael Fondriest (collectively, "Defendants") for summary judgment pursuant to Fed. R. Civ. P. 56 (Doc. 35). Plaintiff Jamison Svoboda ("Svoboda") asserts five causes of action as follows: (1) Failure to Accommodate as to TimkenSteel, 42 U.S.C. § 12112(b)(5) and O.R.C. §§ 4112.02(A); (2) Disability Discrimination as to TimkenSteel, 42 U.S.C. § 12112(a) and O.R.C. §§ 4112.02(A); (3) Failure to Accommodate as to Vogt and Fondriest, O.R.C. §§ 4112.02(A); (4) Disability Discrimination as to Vogt and Fondriest; 42 U.S.C. § 12112(a) and O.R.C. §§ 4112.02(A); (5) Aiding and Abetting Disability Discrimination as to Vogt and Fondriest, O.R.C. § 4112.02(J).

Defendants argue in the motion for summary judgment that Svoboda has not established a genuine issue of material fact either that (1) he is an individual with a disability, or (2) even assuming Svoboda does have a disability, that he sought a reasonable accommodation. Svoboda has opposed the motion, and Defendants have replied. Thus, the motion is ripe for consideration.

Having considered the evidence, applicable law, and the parties' arguments, the Court finds

that Svoboda has not established a triable issue of fact.   Accordingly, and for the reasons set forth herein below, the Court hereby ORDERS that the motion for summary judgment is GRANTED.

## I.      FACTUAL BACKGROUND

Svoboda began working for TimkenSteel on June 17, 2003 as an Intermediate Finishing Line ("IFL") Front End Controller.   (Svoboda Dep. p. 311, Svoboda Dep. Ex. CC.)   The IFL is a continuous steel finishing line located across several buildings of the Gambrinus Steel Plant. Svoboda's primary responsibilities included setting up and operating the IFL to meet customer specifications; "perform all types of mechanical, electrical, welding maintenance installation, and repair work for equipment and machinery in and about" the IFL.   (*Id*.)   Work on the IFL does not require a respirator.   (Vogt Dep. p. 33; 29 C.F.R. § 1910.124.)   No other employees on the IFL wore a respirator.   (*Id*.)

Defendant Michael Fondriest was Svoboda's supervisor from approximately 2013-2014. (Fondriest Dep. p. 7.)   Fondriest became Area Manager of the IFL thereafter, and in 2018, he was promoted to Unit Manager of the IFL.   (Fondriest Dep. p. 6-8.)   Defendant Brent Vogt is a senior manager at TimkenSteel.

Before commencing employment with TimkenSteel, Svoboda filled out a pre-employment questionnaire on May 17, 2013.   He specifically denied ever having asthma, chronic cough, frequent colds, frequent lung infections, lung disease, pneumonia, or shortness of breath.   (*Id*.) During his pre-employment physical on June 23, 2013, Svoboda disclosed that he had only seen one medical professional since 2008, related to an ankle injury.   (Bindra Dep. Ex. C.)   Svoboda provided TimkenSteel with the medical records relative to that treatment prior to being hired effective June 17, 2013.   (*Id*.)

Two months after his pre-employment physical, in August 2013, Svoboda complained

about alleged respiratory problems to his supervisor.   (Bindra Dep. p. 38, Bindra Dep. Ex. G.)

Svoboda was referred to TimkenSteel's Medical Department, where he was evaluated for use of a PAPR and completed the OSHA Respirator Medical Evaluation Questionnaire.   A PAPR is a "full hood breathing device" connected by a tube from the face shield to the air filtration unit on the individual's back.   (Vogt 30(b) Dep. p. 46, Fondriest Dep. p. 19.)   At this time, Svoboda claimed that he had asthma, chronic bronchitis, and had specific allergic reactions to dust and hayfever that interfered with his breathing.   (*Id*.)   These representations contradicted the information he had provided on his pre-employment questionnaire only two months prior. Svoboda had not received any additional treatment since his pre-employment physical, and no physician had ever diagnosed him with the conditions he claimed.   None of Svoboda's medical records from 2011-2013 indicate any history of asthma, chronic bronchitis, or specific allergies. (Bindra Dep. p. 45; Bindra Dep. Ex. H.)   Svoboda never demonstrated any symptoms during physical examinations at TimkenSteel.

Svoboda was examined by Dr. Reichert at the TimkenSteel Medical Department.   He reported irritation and a cough, which started two or three weeks into his employment.   (Bindra Dep. Ex. D.)   Svoboda claimed to frequently suffer from hayfever and stated that he "generally gets a sinus infection twice a year treated through his family physician."   This is not supported by the medical records from Svoboda's family physician, Dr. Bailey.   (Bindra Dep. p. 34.)   He further claimed that he was often on steroids twice a year for his pulmonary/sinus symptomology. (*Id*.)   Svoboda's medical records do not indicate that this was the case.   (MSJ Ex. E.)

Svoboda's physical exam was normal and did not suggest any breathing or respiratory issues.   Dr. Reichart also conducted pulmonary function testing, the results of which were normal. (MSJ Ex. F; Bindra Dep. Ex. E.)   Dr. Reichert asked Svoboda to "bring in written

recommendations from his family physician regarding any work restrictions and five years of medical records related to any breathing problems," and a "return visit here in one week to review the requested material." (MSJ Ex. F.)   In the meantime, Dr. Reichert wrote temporary restrictions to avoid excessive dust and fumes.   (*Id.*)   Svoboda never provided records related to any breathing issues, and he did not provide any written recommendations from a physician.   Thus, Dr. Reichert rescinded Svoboda's temporary restrictions.   (Bindra Dep. Ex. F.)   Svoboda continued to work.

Svoboda saw his family physician, Dr. Bailey, for a non-related medical issue on January 8, 2014, four months after his visit with Dr. Reichert.   (MSJ Ex. E, p. 16.)   There is no evidence that Svoboda told Dr. Bailey about any respiratory issues he was supposedly experiencing at TimkenSteel or any history of lung problems.   (*Id.*)   Svoboda followed up with Dr. Bailey on February 10, 2014, again with no mention of any lung/respiratory issues.   (MSJ Ex. E, p. 13.) Dr. Bailey's records establish that Svoboda's lung function was always normal.   (MSJ Ex. E.) The only remotely relevant diagnosis throughout this time period was Dr. Bailey's diagnoses of a common cold.   (MSJ Ex. E, p. 13.)   Nothing in Dr. Bailey's records supports the respiratory complaints Svoboda reported to Dr. Reichert or suggests any limitation on a major life activity. (Bindra Dep. p. 49.)

On November 11, 2015, Svoboda again sought the use of a respirator, again completed an OSHA Respirator Questionnaire, and saw Dr. Reichert.   (Bindra Dep. Ex. E, L.)   Svoboda had not been treated at the Medical Department since his August 23, 2013 visit and had not seen Dr. Bailey or any other physician since October 14, 2014.   (MSJ Ex. E, p. 10.)   But on his OSHA Questionnaire, Svoboda indicated that he was allergic to trees – and that he had asthma.   (*Id.*) No doctor had diagnosed Svoboda with asthma or a tree allergy.   Dr. Reichert found that

Svoboda's lungs were clear and that his desire for respirator use was not medically necessary, but rather was voluntary. (MSJ Ex. 1.) Svoboda again underwent a pulmonary function test, which was normal. (Bindra Dep. Ex. 1.) There was no medical basis for use of a respirator. Svoboda did not seek any medical treatment from TimkenSteel between November 11, 2015 and June of 2017.

Pulpits were constructed in the IFL in December 2015. These contained air conditioning units that pulled air from the larger buildings in which IFL sits. Svoboda performed the majority of his job duties inside the pulpit after the units were constructed.

In early June 2017, Fondriest reassigned Svoboda to a different location at the Gambrinus plant without pulpits. The reassignment was due to performance issues, including "more delays that the other operators in his work center" with regard to computer crashes. Svoboda's new job responsibilities were the same, with the exception of working in an air conditioned pulpit. Svoboda informed Fondriest – without medical support – that he could not work outside a pulpit.

On June 21, 2017, Fondriest sent Svoboda once again to Dr. Reichert for evaluation. Dr. Reichert conducted a pulmonary function test, noting that the results were normal. (Bindra Dep. Ex. M.) Svoboda's physical exam was likewise normal. Svoboda did not mention fumes to Dr. Reichert. Rather, he told Dr. Reichert that "with particulate exposure he has a burning sensation in his chest and associated with a cough. He states he gets this when he is out on the floor for periods of time." (*Id.*) Dr. Reichert again gave Svoboda a note outlining that he needed to provide "documentation of any respiratory-related diseases and any other restrictions related to any pulmonary symptomology and the ability to wear a respirator." (*Id.*) Dr. Reichert returned Svoboda to work with no restrictions or changes to his work status with a reevaluation in three weeks. (Bindra Dep. Ex. N.) "[T]here is no medical indication for PAPR use short of personal

preference related to a beard, which he states has had since marriage." (MSJ Exs. L, M.)

One week later, despite the clean medical evaluation from Dr. Reichert, Svoboda went to Dr. Bailey and claimed that he had "failed a work physical, failed a breathing test for work" and "would like to discuss a pulmonary expert." (MSJ Ex. E, p. 4.) For the first time, Svoboda claimed he had a fiberglass exposure which caused lung issues. Svoboda explained to Dr. Bailey that, due to a change in his assigned area at work, he "went for a pulmonary lung function test and failed the test." To the contrary, Svoboda's pulmonary function testing was normal. Svoboda further reported that he had sensitivities to dust and would cough and get irritated when out on the floor, "but usually clears in a few days because doesn't happen that often." (*Id.*) He denied any respiratory symptoms including shortness of breath, dyspnea on exertion, cough, wheezing, chest congestion, or chest pain. (*Id.*) Based on the information provided by Svoboda, including the incorrect representation that he had failed a pulmonary lung function test and been exposed to fiberglass, Dr. Bailey referred Svoboda to a pulmonologist and indicated that he would "provide a note for work to maintain current position until further evaluated by pulmonology." (MSJ Ex. E, p. 6.)

On July 3, 2017, five days after seeing Dr. Bailey, Svoboda saw Dr. Bindra, a pulmonologist at the Cleveland Clinic, for respiratory evaluation. Svoboda told Dr. Bindra that he had documented paint fume inhalation in 2006, his main triggers were toxic fume inhalation, and since then he has been intermittently placed on Advair. (Bindra Dep. Ex. A, p. 1.) There is no evidence, medical or otherwise, that these statements are true. They also contradict Svoboda's previous denial of any lung conditions during his pre-employment physical, his OSHA Questionnaires, and the history given to Dr. Reichert and Dr. Bailey. There is no evidence Svoboda ever had any toxic fume exposure or inhalation at TimkenSteel or elsewhere. Svoboda

further informed Dr. Bindra that being on the floor for "even 20 minutes has led to difficulty breathing and chest pain." (*Id*.) He did not mention the alleged fiberglass exposure that he reported to Dr. Bailey or the dust allergy he reported to Dr. Reichert. (Bindra Dep. p. 54, MSJ Ex. N.) Dr. Bindra reviewed the June 21, 2018 spirometry and determined that it showed no abnormalities. (*Id*.) Svoboda's physical exam was normal, and a previous chest x-ray showed clear lung fields. (*Id.*) Dr. Bindra also ordered another spirometry test, which was normal, but with a positive bronchodilator response. (MSJ ex. N, p. 7.)

Relying on the medical history provided by Svoboda, and because Svoboda's pulmonary function indicated normal lung function but with a positive bronchodilator response, Dr. Bindra felt the "possibility" of asthma existed. (Bindra Dep. p. 65.) Dr. Bindra felt that if Svoboda had asthma, it developed in large part from his prior history of allergies and toxic fume inhalation (of which there is no evidence apart from Svoboda's own presentation of his medical history). (MSJ Ex. N, p. 2.) On July 26, 2017, Dr. Bindra sent a letter to TimkenSteel on Svoboda's behalf, indicating that he has asthma and that "Given a properly filtered and climate controlled work environment his symptoms are under control. Without such environment, his prior history suggests a significant risk of bronchospasm and possibly even hospitalization." (Bindra Dep. Ex. P.) Dr. Bindra closed his letter by inviting TimkenSteel to contact him with any questions. (*Id*.)

At his deposition, Dr. Bindra was presented with all of the medical evidence on the record. Thereafter, he acknowledged that his diagnosis of Svoboda was based upon a false history. (Bindra Dep. p. 53-65.) When presented with all the medical evidence, Dr. Bindra concluded that there was no evidence suggesting that Svoboda was substantially limited in any major life activity. Dr. Bailey also testified that Svoboda did not report anything to him that suggested he was substantially limited in any major life activity. (Bailey Dep. p. 70.) Dr. Bailey further testified

that even after Dr. Bindra's asthma diagnosis, Svoboda was not substantially limited in any major life activity. (Bailey Dep. p. 100.)

In July or August of 2017, TimkenSteel moved from an in-house medical department to outsourcing through AultWorks for occupational medicine issues. (Carroll Dep. pp. 8, 13.) On August 10, 2017, Plaintiff was examined by Ryan Carroll, a physician's assistant in TimkenSteel's medical department. (Carroll 30(b)(6) Dep. 20 ¶¶ 21-24, Ex. 3; Vogt 30(b)(6) Dep. Ex. 4, ECF 27-1, 177.) At the August 10, 2017 examination, Plaintiff presented the July 26, 2017 note from Dr. Bindra. (*Id.*) Following the examination, TimkenSteel's medical department provided Plaintiff's supervisors with a Statement of Physical Condition ("SPC") requesting they "[a]llow [Plaintiff the] use of PAPR when working outside of the pulpit." (Vogt 30(b)(6) Dep. Ex. 3, ECF 27-1, 176.) Svoboda gave the letter from Dr. Bindra to Aultworks on August 10, 2017.

Vogt determined that Svoboda could not return to work with the listed restriction because TimkenSteel did not know from what specific fume/particulate/irritant to protect Svoboda. (Vogt 30(b) Dep. p. 41.) Vogt testified that, without that specific information, TimkenSteel could not determine what type of PAPR or filter was necessary to protect Svoboda. (Vogt 30(b) Dep. p. 42.) Vogt additionally stated that, "[s]omebody from medical or our EH&S group would have to tell me." (*Id.* p. 2.) All respirators have "different filtering media, so it depends on what it is you are looking to filter out. They made a filtering media for such things as . . . particulates, dust. They make a filtering media for acids, acid vapors. They make a filtering media for organic vapors, ammonia. So depending on the exposure or the hazard, that is the filtering media you would provide for that level of protection." (Eberhart Dep. p. 19.)

Following Vogt's determination that he could not return to work with the restriction of using a PAPR, Svoboda returned to AultCare on August 21, 2017 to further discuss the necessity of a PAPR. (Vogt 30(b) Dep. Ex. 6.) At that time, Svoboda told Carroll, the physician assistant,

that "it was rare that he would have to use a respirator. So he would go ahead and try to use a normal half-face respirator for the brief and rare periods that he would need to use one." (Carroll Dep. p. 28; MSJ Ex. R.)

A day later, Brianna Bungard, a disability case management nurse at TimkenSteel, emailed Mike Eberhart, a TimkenSteel senior manager in its Environmental Health and Safety department, and stated that Plaintiff had, "an ADA covered medical condition…[TimkenSteel] has an obligation to reasonably accommodate this restriction…offering the PAPR is not an unreasonable accommodation." (Vogt 30(b)(6) Dep. Ex. 11, ECF 27-1, 189.) Elizabeth Hoffman, the TimkenSteel Ethics and Compliance department manager offered by TimkenSteel to testify on its behalf about Plaintiff's requested accommodation, stated that, at the time of the August 22, 2017 email, TimkenSteel did not believe that Plaintiff was disabled under the ADA. She testified that Ms. Bungard was not in a position to make that determination, which instead would have to be made by medical staff and higher level medical managers. (Hoffman 30(b)(6) Dep. 30, 31, ECF 28-1, 202, 203.)

TimkenSteel conducted an air quality test of Svoboda's work environment on August 30, 2017. (Eberhart Dep. p. 12.) Specifically, TimkenSteel tested for particulates, metals, and organics. (*Id*.) The samples at their peak levels were barely detectable and significantly below permissible exposure limits as set by OSHA and the American Conference of Governmental Industrial Hygienists. (*Id*.) Further, these air quality tests indicated that there was no difference in the quality of air within the pulpit, where Svoboda claimed that he did well, compared to the air quality outside of the pulpit or any of the surrounding areas in the plant. (Carroll Dep. p. 14.)

TimkenSteel gave Svoboda the air quality report to provide to his doctor for a more specific determination about what irritant/fume/particulate Svoboda needed protection. (Svoboda Dep. p.232). None of Svoboda's physicians ever identified a specific substance that caused an

issue. (Svoboda Dep. p. 235). TimkenSteel continued to seek the specific information necessary to determine what, if any, accommodation was necessary. (Bailey Dep. Ex. S.)

On December 4, 2017, Svoboda saw Dr. Bailey to obtain a "letter for work place regarding Asthma and airborne particals [sic], to wear a facial mask." (MSJ Ex. E, p. 1.) Based on the information previously provided by Svoboda, Dr. Bailey wrote a note to TimkenSteel that "Jamison suffers from reactive airway disease. Please limit his work environment/exposure to airborne particulate matter." (Bailey Dep. Ex. Q.) Dr. Bailey's note was based upon Dr. Bindra's report – which in turn was based on a medical history provided by Svoboda that is not reflected in any medical records or any other evidence – but provides no specifics as to what particulates were at issue. (Bailey Dep. p. 95). In fact, at deposition, Dr. Bailey could not explain what he meant by "limit his work exposure to airborne particulate matters." (Bailey Dep. p. 95-6.) TimkenSteel asked again for the specific information, which was not provided. (Svoboda Dep. p. 240-41.)

TimkenSteel was also concerned about whether Svoboda could safely wear a PAPR on the floor of the IFL. (Vogt Dep. 12-14.) Fondriest tried on a PAPR to assess the safety of wearing such a device on a factory floor and determined that the use of a PAPR would create an unsafe environment. (Fondriest Dep. p. 17.) Specifically, Fondriest was concerned about the face shield fogging, whether Svoboda could still wear eye protection underneath the PAPR, whether Svoboda could properly communicate with his co-workers on a radio, and how the PAPR limited peripheral vision. (Fondriest Dep. p. 17-19.) TimkenSteel was further concerned about Svoboda's ability to hear, potentially keeping him from hearing a warning regarding mobile equipment in his work environment. (Eberhart Dep. p. 22.) Further, due to a PAPR's size and the fact that the air filtration was worn on the back and connected to the face

shield by a tube, Defendants were concerned about the tube catching on machinery. (Fondriest Dep. p. 19.)

Fondriest tried on and wore the PAPR for "a couple minutes" before deciding there were safety concerns. (*Id.* at 18 ¶¶ 1-5.) Fondriest did not try to simulate Plaintiff's duties while wearing the PAPR, the face shield did not fog while he was wearing it, he did not try to use a radio while wearing it, and he did not attempt to don safety glasses while wearing it. (Id. at 21-24, ECF 589.)

Svoboda never provided the requested information regarding what he needed to be protected from and the safety concerns were never resolved. (Vogt Dep. p. 49.) Svoboda remains a TimkenSteel employee, eligible to return to work after a fitness for duty examination. (Hoffman Dep. p. 49.) Plaintiff has not worked at TimkenSteel since 2017. His duties currently are performed by a non-disabled employee.

TimkenSteel contracted Dr. Rosenberg, a pulmonologist, for an independent medical exam for a potential workers' compensation claim by Svoboda. (Carroll Dep. p. 17-18.) Dr. Rosenberg issued a report, concluding that based upon objective medical testing and a review of all the evidence, Svoboda did not have any respiratory impairment. (Vogt 30(b) Dep. Ex. 9.) Nonetheless, Dr. Rosenberg concluded, "…with a reasonable degree of medical certainty that [Plaintiff] has preexisting respiratory problems…," and that despite normal pulmonary function tests, "….[h]e may very well be more sensitive than the general public because of his pre-existing respiratory disorder and should be allowed to wear a powered air-purifying respirator when working in the general Timken facility." (*Id.* at 187.) While the report cautions that an individual with allergies or hyperactive airways might be more sensitive than the general public, this is based solely upon Svoboda's "subjective symptomology in the work environment."

Carroll interpreted Dr. Rosenberg's report as stating that Plaintiff, "…may be more susceptible to normal particulate than the average person." (Carroll 30(b)(6) Dep. 31 ¶ 25, 32 ¶ 1, ECF 32-1, 611.) In May 2018, Carroll again recommended that Plaintiff be allowed to use a PAPR when working outside a pulpit because, "…with hyperactive airway, even though the particulate matters were within safe, normal levels anywhere, potentially anybody could have reactive airway to what most people would not react to." (Carroll 30(b)(6) Dep. 34, 35, ECF 612.)

## II.    <u>LEGAL STANDARD</u>

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law * * *.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–944 (6th Cir. 1990).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).   Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).   Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."   *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–1480 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C. Cir. 1988)).   The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create

a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

III. **DISCUSSION**

    A. **Disability Discrimination (Counts II and IV)**

The ADA provides, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to establish a prima facie case of disability discrimination, Svoboda must show that he: (1) is an individual with a disability; (2) is "otherwise qualified" to perform the job requirements, with or without reasonable accommodation; and (3) suffered an adverse employment action because of his disability. *Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir. 1997). If Svoboda meets this burden, then Defendants must set forth a legitimate non-discriminatory reason for their adverse actions against Svoboda. *Id.* After Defendants set forth their legitimate non-discriminatory reason, Svoboda must then show that the Defendants' proffered reason is pretextual and that the real reason is discrimination.

In the motion for summary judgment, TimkenSteel argues that Svoboda cannot establish a prima facie case of disability discrimination because he is not a person with a disability as defined by 42 U.S.C. § 4112(A)(13). The Court agrees.

To establish that he is an individual with a disability, and satisfy the first prong of his prima facia case, Svoboda must prove that he has "a physical or mental impairment that substantially

limits one or more major life activities[.]" 42 U.S.C. § 12102 and O.R.C. § 4112(A)(13). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). An activity is "substantially limited" when an individual cannot perform an activity that an average person in the general population could perform, or faces significant restrictions in the "condition, manner, or duration under which the individual an . . . perform [the] activity." 29 C.F.R. § 1630.2(j)(i)-(ii).

Here, Svoboda claims a disability of "asthma" or a "respiratory condition." (Pl. Br. Opp. P. 9, ECF 23, Comp. § 50.) It is clear that asthma constitutes a physical impairment. Regulations promulgated by the Equal Employment Opportunity Commission define physical or mental impairment as "any physiological disorder or condition . . . affecting [the] . . . respiratory [system]." 29 C.F.R. § 1630.2(h)(1). "Asthma is a physiological disorder or condition that affects the respiratory system," and hence is a physical impairment.

Here, Defendants dispute that Plaintiff suffers from asthma. His diagnosis by Dr. Bindra, which indicated the "possibility" of asthma" (Bindra Dep., p. 63), was based in significant part upon what Dr. Bindra acknowledged was an inaccurate medical history provided by Svoboda. When presented with Svoboda's medical records at deposition, Dr. Bindra testified that, "The story I got [from Svoboda with regard to his medical history] was different than the one that is being presented here." (Bindra Dep., p. 61.) Dr. Bindra testified that he was "developing [] suspicions . . . about the credibility of Mr. Svoboda and the credibility of his complaints" regarding his respiratory issues. (Bindra Dep., p. 53.) Dr. Bindra further testified that his July 26, 2017 letter to TimkenSteel, where he recommended a "properly filtered and climate controlled work environment" for Plaintiff, was heavily influenced by Plaintiff's medical history. (Bindra Dep. p. 65.) According to Dr. Bindra, he would have made the recommendation to change Svoboda's

work environment based upon the inaccurate medical history provided with or without objective evidence of asthma such as a positive bronchodilator response. (*Id.*)

Even assuming that Svoboda suffers from asthma, however, this is insufficient to establish a disability. "While asthma, allergies and 'bronchitis-related conditions' are physical impairments that can affect an individual's major life activity of breathing, these illnesses present in varying levels of severity and [a plaintiff] must still prove that [his] condition, be it asthma, allergies or bronchitis, substantially limits his ability to breathe." *Godbold v. Trinity Protection Servs., Inc.*, No. 14-3546, 2017 U.S. Dist. LEXIS 92010, 2017 WL 2579020, at *10 (D. Md. June 12, 2017). Svoboda has not provided any evidence that asthma or any other respiratory condition substantially limits a major life activity, and none of the medical evidence establishes that any alleged condition has substantially impaired his ability to breathe. Indeed, even assuming that Svoboda has asthma or some form of respiratory condition, ***the testimony from all examining physicians was that the condition does not substantially limit any major life activities***. (ECF 35-1, Defs. Motion for Summary Judgment, p. 13-14.) By failing to provide evidence that an alleged respiratory condition substantially limits a major life activity, Svoboda has not met his burden to establish that a genuine issue of material fact remains for trial.

Perhaps recognizing that there is no evidence to support a contention that his alleged respiratory impairment substantially affected the major life activity of breathing, Svoboda endeavors to argue that he "has a physical impairment that, unaccommodated, substantially limits his ability to breathe *in plant* environments." Such a claim is not supported by the medical evidence. Indeed, Svoboda ignores the testimony from Drs. Bailey and Bindra that nothing in Svoboda's medical history suggests a substantial limitation on a major life activity. (Bindra Dep. p. 49, Bailey Dep. p. 70.) Moreover, while Dr. Rosenburg allowed for the possibility that

Svoboda is more sensitive than the general public, this is a far cry from a diagnosis. Dr. Rosenberg concluded based upon objective medical testing and a review of all the evidence that Svoboda did not have any respiratory impairment. (ECF 35-17.) Dr. Rosenberg's evaluation does not set forth any opinion establishing that Svoboda was substantially limited in any major life activity. (*Id.*) Svoboda's "plaint air environment" claim is equally untenable when TimkenSteel's air quality surveys are considered. The surveys show that there is no appreciable difference between the air inside the pulpit, in which he had worked with no respiratory issues, and the air outside the pulpit. (Vogt 30(B)(6) Dep. p. 60; Carroll Dep. p. 14.) Because the air quality is the same throughout the facility, Svoboda's claim is untenable.

Even assuming that Svoboda has some sensitivity, individuals suffering from respiratory sensitivity to airborne agents cannot show a substantial limitation on the major life activity of breathing within the meaning of the ADA when the agents only exist at his place of work. *Minnix v. City of Chillicothe*, 205 F.3d 1341 (6th Cir. 2000) (plaintiff was not substantially limited in a major life activity when he did not have trouble breathing in the absence of diesel fumes); *White v. Honda of Am. Mfg., Inc.,* 241 F. Supp. 2d 852, 857 (S.D. Ohio 2003); *Jackson v. Oil-Dri Corp. of Am.*, 2018 U.S. Dist. LEXIS 71262, *14-15 (N.D. Miss. April 27, 2018) quoting *Jimenez-Jimenez v. Int'l Hosp. Grp., Inc./Casino del Sol*, No. 15-1461, 2017 U.S. Dist. LEXIS 198315, 2017 WL 5905529, at *8 (D.P.R. Nov. 30, 2017 (collecting cases). Here, Svoboda claims are based on a sensitivity to some unspecified particulate matter at work. Thus, he cannot show a substantial limitation on the major life activity of breathing within the meaning of the ADA.

Moreover, to the extent Svoboda claims he is substantially limited in the major life activity of working, an impairment that disqualifies a person from only a narrow range of jobs is

not considered a substantially-limiting one under the ADA. *See Ventura v. City of Indep.*, 108 F.3d 1378 (6th Cir. 1997); *White,* 241 F. Supp. 2d at 858; *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994) (plaintiff not disabled when asthma prevented her from working in one area of a hospital). Svoboda has alleged only that his alleged impairment disqualifies him from working without a PAPR on an IFL in an area of the Gambrinus plant that does not have air conditioned pulpits. This is not the broad range of jobs from which one would have to be disqualified to be considered disabled under the ADA. *See id*.

Svoboda also argues that he is disabled by briefly stating that the evidence establishes that he has a "record of such impairment" that substantially limits a major life activity. (Pl. Br. Opp. p. 9.) Svoboda cannot point to any medical evidence to suggest that any alleged impairment substantially limits the major life activity of breathing. For example, he asserts that "Plaintiff's medical records do, in fact show that he reported fiberglass exposure in an emergency room visit in May 2012." (Pl. Br. Opp. p. 10, citing Svoboda Dep. Ex. BB, ECF 30-2, 524.) No evidence corroborates the alleged exposure. Indeed, Svoboda's medical records indicate that he presented to the emergency room with a persistent cough after allegedly being exposed to fiberglass on May 3, 2012. (ECF 30-2, 517, Svoboda Dep. Ex. BB, p. TimkenSteel_001491.) A chest X-Ray was negative, and he was diagnosed with acute bronchitis, and nothing in his medical records indicates that the condition was caused by any actual exposure. (*Id*.) He was released with no restrictions and had no follow up treatment or care. Even assuming that Svoboda had fiberglass exposure, he has not presented any evidence to connect that exposure to an impairment that substantially limits the major life activity of breathing. There was no diagnosis or suggestion that his condition was anything other than temporary and minor. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,*

849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991), and a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).   For this additional reason, Svoboda has failed to establish an issue of fact for a jury to decide on the question of whether he is an individual with a disability.

Svoboda also argues that he is disabled under the ADA because TimkenSteel regarded him as disabled when Defendant declined to accommodate his desire for a PAPR. The issue, therefore, is whether TimkenSteel mistakenly believed that Plaintiff's alleged asthma substantially limits one or more of his major life activities, such as his ability to breathe or work. *See id.*

As an initial matter, Plaintiff's claim that TimkenSteel mistakenly regarded him as disabled is entirely at odds with his claim that he actually was disabled and entitled to an accommodation.   Binding Sixth Circuit precedent establishes "that a regarded-as disability finding would obviate the [employer's] obligation to reasonably accommodate [the plaintiff]." *Baker v. Windsor Republic Doors,*414 App'x 764, 774 (6th Cir. 2011) citing *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) (Pl. Br. Opp. p. 8, fn, 2.)   It is glaringly inconsistent for Svoboda to argue that he is in fact disabled, and TimkenSteel failed to accommodate him, while simultaneously arguing that TimkenSteel regarded him as disabled.

The inconsistencies in Svoboda's arguments aside, Plaintiff has not presented any evidence that TimkenSteel regarded him as being substantially limited in any major life activity, such as breathing or working.   TimkenSteel did not, as Plaintiff asserts (Pl. Br. Opp. P. 12), testify that it believed Plaintiff was disabled under the ADA.   In fact, Ms. Hoffman stated in her 30(b)(6) deposition exactly the opposite:

Q:	So if you look at Ms. Bungard's email [], the third sentence
of her email begins, "While I believe you are correct
regarding OSHA regulations…," on August 22, 2017, was
Timken's position that Mr. Svoboda had a qualifying
disability under the Americans with Disabilities Act?

	***

A:	I would say no.

(Hoffman 30(b)(6) Dep. p. 30 ¶¶ 16-25, p. 31 ¶ 1-2.)   With regard to the email referenced in her

testimony, Hoffman testified that the author was not in a position to determine if Svoboda was

disabled under the ADA and also that it was factually incorrect.   Hoffman further testified that,

as Defendants "proceeded to have discussions about the employee's restrictions and understood

that medical was not getting what they needed to substantiate his disability, then I would say it

has factual problems."   (Hoffman (30(b)(6) Dep. p. 31.)   Thus, Svoboda fails to establish that

Defendants "regarded him" as disabled.   Indeed, Defendants repeatedly referred Svoboda for

examinations based on his subjective complaints, and returned him to work when those

complaints proved to be medically unfounded.   At this time, Svoboda remains eligible to return

to work after a fitness exam.   Thus, Svoboda has failed to establish an issue of fact on his

"regarded as" claim.

## B.	Failure to Accommodate (Counts I and III)

Svoboda claims that TimkenSteel, Fondriest, and Vogt failed to accommodate him by

allowing him to use a PAPR.   This claim is dependent on the finding that Svoboda is an

individual with a disability.   *Nichols v. OhioHealth Corp.*, 2017 U.S. Dist. LEXIS 131146, *26-

27.   Svoboda's failure to accommodate claim fails out of the gate because this Court has

determined that Svoboda is not an individual with a disability. Even assuming for the sake of discussion that Svoboda is disabled, his failure to accommodate claim fails.

Defendants first argue that Svoboda's proposed accommodation, use of a PAPR, was not reasonable. The ADA requires employers to "mak[e] reasonable accommodations." 42 U.S.C. § 12112(b)(5)(A). The plaintiff bears the initial burden of showing "that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). The defendant then must show either "special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances, or that the proposed accommodation eliminates an essential job requirement." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020). The reasonableness of a proposed accommodation is a question of fact. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998).

Defendants' claim that there were several safety concerns with allowing Svoboda to wear a PAPR. Due to a PAPR's size and that the fact that the air filtration was worn on the back and connected to the face shield by a tube, Defendants were concerned about the tube catching on machinery. (Fondriest Dep. p. 19.) Fondriest was concerned about the face shield fogging, whether Svoboda could still wear eye protection underneath the PAPR, whether Svoboda could properly communicate with his co-workers on a radio, and how the PAPR limited peripheral vision. (Fondriest Dep. p. 17-19.) TimkenSteel was further concerned about Svoboda's ability to hear, potentially keeping him from hearing a warning regarding mobile equipment in his work environment. (Ebhart Dep. p. 22.) However, Fondriest only wore the PAPR for a couple of minutes before deciding there were safety concerns with its use. Fondriest came to this conclusion despite the fact that he made no effort to actually simulate Plaintiff's duties while

wearing the PAPR, the face shield did not fog while he was wearing it, he did not try to use a radio while wearing it, and he did not attempt to don safety glasses while wearing it. (Doc. No. 589.) Moreover, Vogt testified that TimkenSteel never actually reached the determination of whether a PAPR could be safely used by Plaintiff while performing his duties. (Vogt. Dep. 11 pp. 11-13.) Under these circumstances, a factfinder could conclude that Svoboda's proposed use of a PAPR was reasonable. Accordingly, a question of fact remains regarding whether Svoboda proposed a reasonable accommodation consisting of the use of a PAPR. Defendants would not be entitled to summary judgment on the basis that the proposed accommodation of a PAPR was not reasonable.

However, Svoboda's claim that "Defendants could have simply allowed Plaintiff to continue working in an area with a pulpit" as an accommodation is patently unreasonable as a matter of law. First, Fondriest's unrebutted testimony was that Svoboda was transferred from an area with a pulpit due to productivity and efficiency issues. Second, TimkenSteel's air quality tests indicated that there was no difference in the quality of the air within the pulpit where Svoboda claimed that he did well, compared to the air quality outside of the or any of the surrounding areas in the plant. (Defs. MSJ, p. 14, quoting Carroll Dep. p. 14.) In other words, any alleged "particulate exposure" would be the same outside the pulpit as inside. Thus, the pulpit would not protect Svoboda from any airborne particulates that aggravate his alleged condition. Accordingly, no finder of fact could conclude that transferring Svoboda to an area of the plant that uses pulpits would be a reasonable accommodation.

Defendants also argue that Svoboda failed to engage in the ADA's mandatory interactive process of determining how best to accommodate his disability. Once an employee requests an accommodation, the employer and employee have a mutual duty to engage in an interactive

process.  *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir. 2020).   From that point, both parties have a duty to participate in good faith.   *Id.*   Once the employee establishes a prima facie showing that he proposed a reasonable accommodation, the employer has the burden of showing how the accommodation would cause an undue hardship.   If the interactive process was triggered but not successfully resolved, courts should attempt to isolate the cause of the breakdown and then assign responsibility.   *Id.*

In this case, no one, including Svoboda, could identify what substance created any issue or required respiratory protection.   (Defs. MSJ p. 18.)   Without that specific information, TimkenSteel could not determine what type of respirator or filter was necessary to protect Svoboda.   (Vogt 30(b) Dep. p. 42.)   All respirators have "different filtering media, so it depends on what it is you are looking to filter out.   They made a filtering media for such things as . . . particulates, dust.   They make a filtering media for acids, acid vapors.   They make a filtering media for organic vapors, ammonia.   So depending on the exposure or the hazard, that is the filtering media you would provide for that level of protection."   (Eberhart Dep. p. 19.)

In circular fashion, Svoboda argues, "Defendants knew as early as June 2017 that [P]laintiff needed to be protected from airborne particulates[,]" and "Dr. Bailey specifically identified particulate matter as the culprit."   (Pl. Br. Opp. p. 10.)   However, this is inconsistent with what Svoboda told Dr. Bindra: that he had previously experienced paint fume inhalation, and that his triggers in the work environment were "toxic fume inhalation."   (Bindra Dep. pp. 15, 20.)   It is notable that there is no objective medical evidence of any toxic fume exposure or inhalation.

Defendants conducted an air quality test so Svoboda's physicians would know what specific particulates/fumes/gases were present in Svoboda's work environment.   Svoboda was

provided with the test results, and TimkenSteel requested multiple times that he take the results to his physician to identify the specific irritant at issue so TimkenSteel could properly protect against that substance.   Neither Svoboda nor his physicians ever provided this information.

Dr. Bailey wrote a note to TimkenSteel that "Jamison suffers from reactive airway disease.   Please limit his work environment/exposure to airborne particulate matter."   (ECF 35-21.)   However, Dr. Bailey could not explain what he meant by "limit his work exposure to airborne particulate matters."   (Bailey Dep. pp. 95-6.)   TimkenSteel asked again for the specific information, which was never provided.   (Svoboda Dep. p. 240-42.)   Svoboda offers no evidence or argument to contradict Defendants' contention.   Instead, Svoboda ignores Dr. Bailey's inability to explain his recommendation, and simply states that Defendants knew that "... [p]articulates is another name for dust."   (Pl. Br. Opp. p. 11, quoting Eberhart 30(b)(6) Dep. p. 29, Hoffman 30(b)(6) Dep. Ex. 15.)

Svoboda insisted on having a PAPR as opposed to any other form of respiratory protector.   To the extent airborne particulates are what Svoboda now claims aggravate his alleged respiratory sensitivities, the evidence establishes that a PAPR is designed for vapors, not particulate matter.   (ECF 28-1, 221, Hoffman 30(b)(6) Dep. Ex. 15.)   According to the testimony on record, a PAPR is "way overkill for dust."   (*Id*.)   Further, respiration protection is based on protection factors, which are NIOSH approved and published.   TimkenSteel requires a "doctor [] to determine what protection level is required to protect the employee." TimkenSteel's witness testified that TimkenSteel will then accommodate by supplying the correct respirator based on the protection level the doctor orders."   (*Id*.)   Svoboda did not provide any evidence to contradict the necessity of the information, and he never provided a medical opinion regarding what level or type of protection he required.   Accordingly, Svoboda

23

cannot point to any genuine issue of material fact to establish that he complied with the ADA-mandated interactive process. Even if Svoboda qualified as an individual with a disability (which he does not), his failure to accommodate claim would fail as a matter of law due to this noncompliance.

### C.  Liability of Vogt and Fondriest

Svoboda argues that Vogt and Fondriest are liable pursuant to R.C. 4112 for their "discriminatory conduct." (Pl. Br. Opp. p. 12.) However, as this Court has explained, Svoboda cannot establish a prima facie case of discrimination or failure to accommodate against any defendants. Accordingly, Vogt and Fondriest are not liable.

## IV.  CONCLUSION

For the reasons stated herein above, Svoboda fails to satisfy his burden to establish that there are genuine issues of material fact for a jury to decide on any of his claims. Defendants are thus entitled to summary judgment under Federal Rule of Civil Procedure 56(E). Accordingly, Defendants' Motion for Summary Judgment (Doc. 35) is GRANTED in its entirety.


**DATED:**      March 30, 2020              **IT IS SO ORDERED.**

                                           **s/John R. Adams_____**
                                           **JOHN R. ADAMS**
                                           **UNITED STATES DISTRICT JUDGE**